THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MELVIN LUCAS *et al.*, Defendants-Appellants.

First District (1st Division)   No. 62538

Opinion filed March 20, 1978.

James J. Doherty, Public Defender, of Chicago (David W. Hirschboeck, Assistant Public Defender, of counsel), for appellant Marcus Hall.

James Geis, of State Appellate Defender's Office, of Chicago, for appellant Melvin Lucas.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Joan S. Cherry, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Marcus Hall and Melvin Lucas (defendants) were found guilty of murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) and attempt armed robbery (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4, 18—2). Hall and Lucas were sentenced to 35 to 150 and 50 to 150 years respectively for murder. Each was also sentenced to consecutive terms of 4 to 12 years for attempt armed robbery. Defendants have filed separate appeals.

Defendant Hall advances five contentions: the trial court erroneously allowed the State to introduce incompetent substantive evidence under the guise of impeachment; the granting of a previous mistrial in this case

precluded the subsequent prosecution; the trial court should have granted his motions for severance and substitution of judges and the sentences imposed were excessive.

Defendant Lucas raises two issues: improper impeachment as raised by Hall and the sentences exceed the permitted statutory maximum.

In view of the separate briefs and issues, the appeals will be discussed separately. We will first state the pertinent facts common to both.

On July 16, 1973, at approximately 9:30 p.m., Gwendulyn Williams, 18 years old, was in her vegetable garden in Chicago. She noticed a man standing next to a car parked under a streetlamp some 15 to 20 feet away. She also saw defendants Lucas and Hall, both of whom she had known for over a year, walk across the street together toward the man. Lucas had a towel in his hand and she noticed something in the towel. As they approached the man she heard Lucas say, "Stone Love, this is a stick-up." As the man reached into his pocket she heard a shot. She saw the man stagger and fall. The defendants ran off through a playlot across the street. She immediately went to her apartment and called the police. She returned to the scene and saw Lucas on the street about 10 minutes after the shooting. He said to her, "I know you seen us there, Slim. You won't tell nobody, will you?" She told him that she would not.

Williams also testified that approximately 3 hours before the shooting she overheard a conversation among a group of boys at a playlot. Both defendants Hall and Lucas were present. They spoke about money needed to provide bail for a friend. There was also mention of a gun. On cross-examination she testified that she did not hear Hall say anything at that time.

Also on cross-examination she testified that she had previously given the police a statement in which she said that Lucas crossed the street first and Hall followed behind him. She stated that this statement was not the truth. On redirect examination she testified that at a preliminary hearing subsequent to the giving of this statement, she had denied its contents. She testified she had done so because she had been threatened and she didn't want to be "beat up" or "jumped on no more."

John Harris testified that he had known Hall for "about a year" and Lucas for a "couple of years." At approximately 6 p.m. on the night of the shooting, Lucas and Hall asked him if he "wanted to stickup." Harris refused to join them. In addition, Hall asked Harris if he had any shotgun shells. Hall said that the stickup was to obtain money to bail a friend out of jail.

At the time of the shooting, Harris was walking some 200 feet to the west of the victim's car. He saw the victim standing under the streetlight with Lucas and Hall. There was a "tussle" and "either Marcus [Hall]

grabbed the man or the man grabbed Marcus." Lucas pushed Hall to one side and there was a flash accompanied by a "loud boom." The flash came from a towel wrapped around Lucas's hand. Later that night Harris met Lucas at a playlot and Lucas said to him, "I shot that mother fucker."

Cross-examination of Harris brought out that he had not informed the police of what he saw until 14 months after the incident occurred. At that time he was arrested for intimidating Williams. He was questioned by the police in regard to the shooting. After telling the police what he knew, he was allowed to leave. He was never booked for the alleged intimidation.

On redirect examination Harris stated that he did not intimidate Williams, but had merely warned her off. He further stated that no one made any promises to him in return for his testimony against the defendants.

Next, the State requested the court to call Cleo Jones as a court's witness. The State urged that it was unable to vouch for Jones's veracity because he had made contradictory statements prior to trial. Counsel for both defendants objected on the ground that the State's sole purpose was to put in evidence, under the guise of impeachment, prior statements by the witness inculpating the defendants. Jones was called as a court's witness and the State was allowed to cross-examine him.

The State first elicited from Jones a series of denials as to any knowledge of the occurrence. Next Jones was questioned at length concerning a written statement that he signed at police headquarters a few days after the shooting. The statement was basically similar to the testimony of Williams and Harris except that Jones stated therein that Hall ran over to the car and reached for the victim's pocket after Lucas had begun the attempted robbery but before the shot was fired. Using verbatim language from the statement, the prosecutor asked the witness if many of the questions appearing in the statement were put to him and if the responses appearing therein were made by him. This process covered the important and material portions of the statement. Objections to this process were overruled by the trial court.

Jones admitted signing each page of the statement and said he had glanced at it prior to signing. He denied, however, that he gave any such statement to the police. He testified that the police had arrested him for the murder and told him that unless he signed the statement they had prepared he would be charged with the murder. He signed the statement and was released.

Deputy Sheriff Longo testified that he was present while Jones was being questioned by the prosecutor the day before Jones testified. Longo overheard Jones tell the prosecutor that the content of the statement he gave the police was true and he had not been threatened or coerced into

giving the statement. During the questioning of Longo it was again brought out that Jones's statement implicated both Lucas and Hall. Both defendants objected to Longo's testimony as being an improper form of attempted impeachment.

The State also called Edmond Pyrcioch, the Chicago Police Department investigator that took the written statement of Jones. Pyrcioch testified that Jones was not threatened or forced into giving the statement. He then acknowledged, over objection, each question and answer, covering the substance of the entire statement as having been asked by him and answered by Jones.

During closing argument the prosecutor requested the jury to consider that Jones told the police that Lucas shot the victim. He also told the jury that although he could not vouch for Jones's credibility in the courtroom, the jury had heard the statement Jones gave the police and also heard other witnesses place Jones at the scene, thereby implying that Jones's statement to the police was believable.

In its instructions to the jury the trial court stated that evidence of a witness's prior inconsistent statement may be considered in deciding the weight to be given the testimony of that witness. There was no instruction cautioning the jury not to consider the prior inconsistent statement as evidence of either parties' guilt.

Neither of the defendants testified at trial. A written statement that Lucas had made and signed upon his arrest was admitted into evidence. All references to defendant Hall were excised from this statement and it was read to the jury. From the statement read to the jury it is clear that Lucas and another person attempted to rob the victim at gunpoint. The identity of the other person was not stated. The pertinent portion of the statement as excised reads: "I had the gun behind my head. We walked up to the man and I said, 'It's a stickup.' Then I say, 'No, man, no.' Then I say, 'Let's go, man.' We ran back towards the playground."

■■ Both defendants contend the trial court erred in allowing the State to bring in out-of-court statements as substantive evidence of their guilt under the guise of impeachment. The law of Illinois is strong and definite that a prior inconsistent statement may not be used as substantive evidence of guilt. (*People v. Bailey* (1975), 60 Ill. 2d 37, 322 N.E.2d 804; *People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564; *People v. Rudolph* (1977), 50 Ill. App. 3d 559, 365 N.E.2d 930, *appeal denied* (1977), 66 Ill. 2d 635.) As stated by the supreme court in *People v. Paradise* (1964), 30 Ill. 2d 381, 384-85, 196 N.E.2d 689:

> "[T]his court has refused to allow a conviction to be based solely on unsworn statements by witnesses [citations], or to permit such unsworn statements to be offered virtually for the purpose of using

them as testimony. [Citation.] And, to lessen the risk of the properly admitted prior inconsistent statement of a witness being considered by the jury as testimony, this court has required that the impeachment *not be repetitious* [citation] and that the jury be *clearly cautioned and instructed* to limit its consideration of such evidence for its proper purpose. [Citation.]" (Emphasis added.)

In our opinion, the record before us demonstrates that the impeachment of Cleo Jones was unduly repetitious. The prosecutor not only read virtually the entire statement by Jones into the record on cross-examination, but he also repeated virtually all of this material during the testimony of Investigator Pyrcioch. In addition, the prosecutor repeated the substantive portions of Jones's statement while questioning Deputy Sheriff Longo. Finally, the prosecutor attempted to add substantive weight to Jones's statement in closing argument by implying that the jury was to believe the statement over the in-court testimony of the witness.

■■ We also find here a lack of a properly limiting instruction. The only mention of the impeachment in the instructions was that the jurors could consider the prior inconsistent statement in deciding the weight to be given Jones's testimony. (Illinois Pattern Jury Instructions, Criminal, No. 3.11 (1968).) The jurors were not instructed that they were not to consider that statement as substantive evidence of the defendants' guilt. In *People v. Bailey* (1975), 60 Ill. 2d 37, 322 N.E.2d 804, the court held the use of the prior statement as substantive evidence was reversible error even though it was accompanied by a proper limiting instruction. *A fortiori* the error is more apparent in the absence of such an instruction as in the case before us. This use of the prior statement of the witness exceeded the bounds of legitimate impeachment and constituted an improper use of the out-of-court statement as substantive evidence against these defendants. We will consider the effect of this as to each defendant separately.

In our opinion, this trial error by the prosecution does not necessarily lead to the result that the conviction of Lucas should be reversed. On the contrary, the evidence against Lucas was so strongly convincing of his guilt beyond reasonable doubt, completely without reference to the Jones statement, that we feel the error was harmless. Lucas was identified by two eyewitnesses both of whom knew him for over a year. Both witnesses saw Lucas shoot the victim and Lucas admitted to both that he had in fact shot the man. Furthermore, Lucas admitted to the police both orally and in writing that he took part in the attempted robbery and was present when the shooting occurred. The independent evidence of his guilt is properly described as overwhelming, quite aside from the Jones statement.

The issue presented here has no Federal constitutional basis. It involves

only the question whether under the law of Illinois "the competent evidence is sufficient to prove" the guilt of defendants beyond a reasonable doubt. (*People v. Bailey* (1975), 60 Ill. 2d 37, 46-47, 322 N.E.2d 804, Ryan, J., dissenting.) The testimony of Williams and Harris raises issues of credibility, but it is strongly corroborated by the oral and written statements by Lucas himself. It is indeed difficult to imagine a verdict as to Lucas different from the one returned by the jury. We find that the error above described, as to Lucas, was harmless beyond a reasonable doubt. The conviction of Lucas is affirmed.

Upon considering the conviction of defendant Hall, the record presents an entirely different aspect. Hall made no inculpatory statements to the witnesses Gwendulyn Williams or John Harris. Hall made a written statement to the police, but it was entirely exculpatory and was not offered in evidence by the State. Hall made no oral inculpatory statement to the police as did Lucas. Consequently, the only competent evidence against Hall is the testimony of the two eyewitnesses. It is correct that both of these witnesses knew Hall for some time. However, in both cases, cross-examination was effective to bring out certain elements which tended to cast doubt upon their statements as regards the guilt of defendant Hall. Taken as a whole, the testimony of these two witnesses, as to Hall, raised an issue of credibility which it was necessary for the jury to decide. Defendant Hall was entitled to have this issue decided by a trier of fact which was not prejudiced by incompetent evidence. The tactics of the prosecution in this case involving the placing of the entire out-of-court statement of the witness, Cleo Jones, before the jury as substantive evidence, and then deliberately accentuating the substantive character of this statement by the testimony of Investigator Pyrcioch and Deputy Sheriff Longo, and by oral argument to the jury, combined with the absence of a limiting instruction to the jury, serve to convince us that we cannot conclude that the error was harmless. Men have fought valiantly and died gloriously to insure the right to a fair trial for every defendant in a criminal case. We cannot permit denial or even erosion of this right by prosecutorial misconduct. The conviction of Hall is accordingly reversed and the cause remanded for a new trial.

As above shown, Hall raised three additional issues regarding the merits of this conviction. The issues regarding severance and substitution of judges need not be considered. We will consider the issue of double jeopardy.

Trial of this cause originally commenced during September 1974. The proceedings terminated when the trial court declared a mistrial. Defendant Hall raised the issue of double jeopardy upon commencement of the later trial. In the first trial, counsel for defendant Hall was admonished by the trial judge not to elicit any answer from a State's

witness which was "inculpatory of Melvin Lucas through an out-of-Court statement of Marcus Hall." The court also directed the State's witness not to answer any question in a manner which would tend to show that Hall made any statement inculpating Lucas in the commission of the crime. On cross-examination of this witness, Hall's attorney, in direct contradiction of the direction of the trial court, repeatedly asked leading questions of the witness which clearly indicated to the jury that Hall had made a statement to the police inculpating Lucas. After repeated objections were sustained and it became obvious that the trial attorney for Hall would not desist from this line of questioning, Lucas's counsel moved the court to declare a mistrial. The court declared Hall's attorney in contempt and granted the motion for a mistrial over Hall's objection. The trial attorney for Hall objected to the mistrial although, as the trial court noted, he had previously made "close to twenty" such motions himself.

It has been repeatedly held that a mistrial in a criminal prosecution should be granted whenever, "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." (*United States v. Perez* (1824), 22 U.S. (9 Wheat.) 579, 580, 6 L. Ed. 165. See also *Arizona v. Washington* (1978), 46 U.S.L.W. 4127, 4129.) In *Illinois v. Somerville* (1973), 410 U.S. 458, 464, 35 L. Ed. 2d 425, 431, 93 S. Ct. 1066, 1070, the supreme court held:

> "A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial. If an error would make reversal on appeal a certainty, it would not serve 'the ends of public justice' to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court."

■■ In our opinion, the record here demonstrates that Hall's attorney was attempting to place Hall's out-of-court statement, which inculpated Lucas, before the jury. This was highly improper and in direct violation of a specific order of the trial court. If the trial court had permitted this line of examination to continue, an extremely prejudicial condition would have resulted.

In his brief defendant Hall appears close to conceding that his counsel's error was serious but claims that it did not meet the "manifest necessity" test of *Perez* and *Somerville* because there were "less drastic alternatives" available to the court. Specifically, he claims that the court should have granted a severance as to Lucas thereby relieving Lucas of the prejudice of the error while allowing the trial to continue as to Hall. We reject this

argument. The State points out in its brief, and it is abundantly clear from the record, that Hall's trial attorney was determined to obtain a severance despite denial of his motion by the court. He made numerous motions in this regard. The trial court in its exercise of discretion, denied each such motion. Trial counsel cannot be permitted to circumvent a valid order of the trial court and obtain by misconduct the result which he failed to obtain by motion. Even if the trial court had erroneously denied the motion for severance, it was the duty of trial counsel for Hall to accept the ruling of the court and not deliberately violate repeated admonitions by the trial court.

■■ The Supreme Court of Illinois has held that granting of a mistrial is a matter within the discretion of the trial court and where this discretion has been properly exercised no issue of double jeopardy will arise. (*People v. Chaffin* (1971), 49 Ill. 2d 356, 362, 274 N.E.2d 68; *People v. Thomas* (1958), 15 Ill. 2d 344, 155 N.E.2d 16, *cert. denied* (1959), 359 U.S. 1005, 3 L. Ed. 2d 1034, 79 S. Ct. 1143.) We characterize the granting of the mistrial by the trial court here as not only well within the bounds of reasonable discretion but also as a proper legal action.

The final problem is the sentences. Reversal of the Hall conviction eliminates the need of deciding the point in his appeal. Defendant Lucas urges that the aggregate minimum term in the consecutive sentences imposed by the court exceeds the statutory limitation in effect on the date the crime was committed. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4(c).) The People concede this point. They suggest this court should, alternatively, remand for resentencing or modify the sentences so as to be concurrent in lieu of consecutive. (*People v. Morgan* (1974), 59 Ill. 2d 276, 319 N.E.2d 764.) We will adopt the former course.

Accordingly, the judgment against defendant Melvin Lucas is affirmed except that the sentence is vacated and the cause is remanded for sentencing. The judgment against defendant Hall is reversed and the cause is remanded for a new trial.

Affirmed in part, sentence vacated and remanded for sentencing as to Lucas; reversed and remanded as to Hall.

McGLOON and O'CONNOR, JJ., concur.